**FOR PUBLICATION**                                                                                     **CLOSED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| IRVING D. ISKO, | : | |
| | : | |
| Plaintiff, | : | **AMENDED OPINION** |
| | : | |
| v. | : | Civ. No. 05-333 (WHW) |
| | : | |
| ENGELHARD CORPORATION and | : | |
| KATHE JADOS, f/k/a KATHE JADOS | : | |
| ISKO, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**Walls, District Judge**

Plaintiff Irving Isko moves to remand this case to the Superior Court of New Jersey, Law Division, Morris County. Defendants Engelhard Corporation and Kathe Jados removed this case from the Superior Court of New Jersey on the ground that the state law claims asserted by plaintiff are preempted by ERISA, making removal proper. Because the Court finds that plaintiff's claims are not preempted by ERISA, the matter is remanded.

**FACTS AND PROCEDURAL BACKGROUND**

These are the facts as alleged in the Complaint: Plaintiff was employed continuously by Engelhard and its predecessors in senior executive positions from November 1, 1956 until February 22, 1984. From 1956 until 1967, he served first as the vice president in charge of legal and tax matters, and of certain business operations, at Philipp Brothers, Inc. and then later as vice president of its successor, Minerals and Chemicals Philipp Corporation, and vice president of the Philipp Brothers Division of Minerals and Chemicals Philipp Corporation. When Minerals and

FOR PUBLICATION                                                                                               CLOSED

Chemicals Philipp Corporation acquired Engelhard Industries, Inc., plaintiff was appointed vice president, and later senior vice president, of the newly renamed Engelhard Minerals & Chemicals Corporation ("EMCC"), while also continuing as an executive of that entity's Philipp Brothers Division. In December 1971, he was appointed by the Board to oversee the entire worldwide operations of the Engelhard Industries Division of EMCC, which he continued to do until 1981.

In 1981, the Board of Directors of EMCC decided to spin-off, as a separate, publicly-traded entity, all of the operations and assets of the Engelhard Industries Division and the Minerals and Chemicals Division of EMCC. Pursuant to the terms of the spin-off, plaintiff stepped down from his position at EMCC and became president and chief executive officer of Engelhard.

The terms of plaintiff's employment as president and CEO of Engelhard were part of the document submitted to, and approved by, the shareholders of EMCC in approving the spin-off. These terms were memorialized in a May 20, 1981 written employment agreement signed by Milton F. Rosenthal, Chairman of the Board of Directors of Engelhard, on behalf of Engelhard, and by plaintiff (the "Employment Agreement"). The term of employment was to be for a period of five years, commencing on May 20, 1981 and ending on May 20, 1986. Plaintiff was to receive an annual salary plus discretionary regular and special cash bonuses, shares of Engelhard common stock and certain stock option privileges and other perquisites.

In addition, Engelhard agreed that plaintiff was entitled to participate in various employee benefit plans maintained by the company, including the arrangement that is at issue in this litigation: the Excess Benefit Plan. The Excess Benefit Plan is part of Engelhard's Supplemental

**FOR PUBLICATION**                                                                                                  **CLOSED**

Retirement Program.  The Supplemental Retirement Program consists of two separate plans, the Excess Benefit Plan and the Supplemental Executive Retirement Plan.  Plaintiff was only eligible to participate in the Excess Benefit Plan.  The Excess Benefit Plan directly states the purpose of the plan:

> The purpose of the Excess Benefit Plan is to provide certain salaried employees with a pension benefit payable from employer funds, notwithstanding the limitations of Section 415 of the Internal Revenue Code as from time to time in effect (or of any similar provisions of the Code or any other law or regulations that may now or hereafter limit benefits payable under qualified pension or retirement plans (all of which are herein referred to as "Section 415 limitations")), having an actuarial value equivalent to the excess of the amount of benefits which would have been payable to such employees under the Retirement Income Plan for Salaried Employees of Engelhard Corporation ("Pension Plan") were it not for the Section 415 limitations over the amount thereof in fact payable under the Pension Plan.

(Pl.'s Ex. B at ¶ 1).  Section 415 provides that any trust forming a part of an employee pension benefit plan shall not constitute a "qualified" trust -- permitting employees to defer until retirement taxation of amounts promised to them under the plan -- unless the plan provides that the benefits to be paid thereunder do not exceed the limitation specified therein. 26 U.S.C. § 415. Engelhard also maintained a trusteed plan: the Retirement Income Plan for Salaried Employees of Engelhard Corporation. Unlike the Excess Benefit Plan, the Retirement Income Plan for Salaried Employees of Engelhard Corporation is subject to the section 415 limitation.  Benefits under the Excess Benefit Plan are paid from Engelhard's general assets and are not separately funded. Moreover, the express language of the Excess Benefit Plan declares that the provisions of ERISA do not apply to it.

In 1979, the United States Dept. of Justice, Antitrust Division, ("DOJ") issued to EMCC a civil investigative demand, part of the DOJ's investigation starting in 1978 of possible monopoly control in the platinum industry. At the time, Anglo-American Corp. of South Africa, which owned a major competitor and a major supplier of EMCC, had three nominees on the board of directors at EMCC. On behalf of EMCC, Isko oversaw the company's cooperation with the DOJ investigation and coordinated its response to the DOJ's investigatory allegations. These efforts led to the DOJ's agreement, in 1980, to end its investigation of EMCC if the company agreed not to increase Anglo-American's authority over the company and, particularly, to restrictions on the number of Anglo-American associated persons who could be members of EMCC's board of directors. Plaintiff, on behalf of EMCC, entered into such a written settlement agreement with the DOJ, including a written document dated April 18, 1980. As a result, the DOJ closed its investigation of the company.

After the spin-off in 1981, and more particularly in the period leading up to February 21, 1984, Anglo-American Corp. of South Africa took steps to increase its control over Engelhard. Plaintiff opposed those efforts inasmuch as, in his opinion, those steps would violate the intentions of the agreement between EMCC and the DOJ. On February 21, 1984, the Board of Directors of Engelhard met and discussed the re-nomination of plaintiff as a Board member as his three-year term was expiring. Despite Engelhard's commitment to plaintiff that he remain as a member of the company's board of directors throughout the five-year term of his employment agreement, the Board would not re-nominate plaintiff as a director unless he agreed to cease his opposition to Anglo-American Corporation's efforts at controlling Engelhard's board of

**FOR PUBLICATION**                                                                                          **CLOSED**

directors.  Plaintiff refused and as a result he was not re-nominated as an Engelhard Board member.

With more than two years remaining under his Employment Agreement, plaintiff and Engelhard agreed, in a document executed February 22, 1984, that plaintiff would retire, subject to certain conditions.  Among other conditions, plaintiff's retirement was conditioned upon Engelhard promptly paying to plaintiff, for services previously rendered, a lump sum payment discounted to present value, of the full balance of all salary and bonuses to which he would have been entitled had he been permitted to complete the full term of his Employment Agreement, and his retirement would become effective upon receipt of that payment.  As of February 22, 1984, the agreed-to present value of plaintiff's base salary and cash bonuses for past services was $1,938,802.33. On February 22, 1984, Engelhard paid this amount (less tax withholding) to plaintiff by company check. The February 22, 1984 agreement included the 1984 lump-sum payment "in the calculation of the pension base under the applicable rules of the respective Company pension plans."

Pursuant to the February 22, 1984 agreement, in 1986, plaintiff began receiving his Excess Benefit Plan payments.  Initially, he elected payment in the form of a joint and 100% contingent survivor annuity, designating his then wife, defendant Kathie Jados Isko, as the contingent survivor annuitant. Before payments began, plaintiff changed his election to a joint and 95% contingent survivor annuity (the "Joint and 95% Survivor Annuity"), under which plaintiff would receive a monthly payment from Engelhard for life, and Jados would receive 95% of that monthly amount monthly for life, provided she survived plaintiff. Plaintiff also gave

**FOR PUBLICATION**                                                                                             **CLOSED**

Engelhard written payment instructions (the "Payment Instructions"), which, inter alia, referenced plaintiff's election of a joint and survivor annuity form of benefit, the addresses to which payments were to be mailed, and the social security numbers of the plaintiff and Jados. The Payment Instructions also expressly stated that they "shall remain in force and effect until revoked by a writing filed with Engelhard Corporation." Engelhard accepted plaintiff's Payment Instructions without objection.

      In January 2003, Jados filed an action in the Superior Court of the State of New Jersey, Chancery Division, seeking a divorce from plaintiff. Plaintiff thereafter commenced an adjustment to his estate plan to recognize the fact that New Jersey's elective-share statute would no longer apply to her. As part of this effort, plaintiff began discussions with Engelhard about how this estate plan adjustment could be achieved in the survivorship annuity of his Excess Benefits Plan payments. In particular, plaintiff desired to change the Payment Instructions with regard to the direct contingent survivor annuity to Jados to a trust of which Jados would be a beneficiary and with respect to which non-party Susan Isko would also be a beneficiary. The trust would be used to satisfy plaintiff's continuing alimony obligation to Jados after his death.

      There followed a series of discussions and written communications and responses between plaintiff, his counsel, Engelhard, and its counsel. Plaintiff sought Engelhard's agreement and compliance with the change of the Payment Instructions. Engelhard representatives advanced various reasons for not agreeing to or complying with this change. On May 26, 2004, during the extended course of these communications and responses, the New Jersey Superior Court granted plaintiff and Jados a divorce. The Decree of Divorce was entered

**FOR PUBLICATION**                                                                                      **CLOSED**

on July 2, 2004. On August 27, 2004, Engelhard, through counsel, responded to a letter from plaintiff and claimed that ERISA governed plaintiff's retirement award because his compensation was imputed, not paid to him. Engelhard did not assert any other basis for ERISA's application to the Excess Benefit Plan nor any other ground for federal jurisdiction.

In addition to allegations that Engelhard wrongly failed to change the payment instructions, plaintiff also alleges that Engelhard incorrectly calculated the payable benefit under the Excess Benefit Plan and the Termination Agreement.

In his Complaint, plaintiff brings six state law claims against defendants: Count One alleges that Engelhard breached its fiduciary duty to plaintiff when it refused to honor the change in the payment instructions. Count Two, that Engelhard breached its fiduciary duty to plaintiff when it incorrectly calculated the single-life and 95% contingent survivor annuity amount due to him under the Excess Benefit Plan and the Termination Agreement. Count Three seeks a declaratory judgment against both defendants that plaintiff is entitled to change in writing his payment instructions and that defendants must abide by these instructions. Count Four seeks a declaratory judgment of the correct amount of payments to be made to plaintiff. Count Five alleges that Engelhard breached its contract with plaintiff by refusing to honor the change in the payment instructions. And Count Six charges that Engelhard breached its contract with plaintiff when it incorrectly calculated the single-life and 95% contingent survivor annuity amount due to plaintiff under the Excess Benefit Plan and the Termination Agreement and paid him such incorrect amounts.

**FOR PUBLICATION** **CLOSED**

On January 19, 2005, defendant Engelhard removed this case from the Superior Court of New Jersey, Morris County on the ground that the claims asserted by plaintiff are governed by ERISA. Defendant Jados joined in the notice of removal; both defendants oppose the motion to remand, relying on Engelhard's brief. Because Engelhard is the removing party, the burden is on it to show that this Court has subject matter jurisdiction over plaintiff's claims.

## STANDARD FOR REMAND

28 U.S.C. §1447(c) provides in pertinent part: "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded. An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal."

When confronted with a motion to remand, the removing party has the burden of establishing the propriety of removal. Boyer v. Snap-On Tools Corp., 913 F.2d 108, 111 (3d Cir. 1990), cert. denied, 498 U.S. 1085 (1991). Moreover, "removal statutes 'are to be strictly construed against removal, and all doubts resolved in favor of remand.'" Id. at 111 (citations omitted).

## DISCUSSION

Does this Court have subject matter jurisdiction over plaintiff's claims? Plaintiff contends that this Court lacks subject matter jurisdiction over plaintiff's claims because the benefit plan at issue, an unfunded "excess benefit" plan, is not governed by ERISA. Plaintiff offers two reasons why this is so. First, plaintiff relies on the document attached to his Complaint that describes the Excess Benefit Plan and reads "[t]he provisions of the Employee

**FOR PUBLICATION**                                                                                                **CLOSED**

Retirement Income Security Act of 1974 ("ERISA") relating to employee pension benefit plans and/or employee welfare benefit plans shall have no application to the Excess Benefit Plan." (Pl.'s Ex. B at ¶ 8).

Second, plaintiff relies on section 4(b) of ERISA which declares in pertinent part: "[t]he provisions of this subchapter shall not apply to any employee benefit plan if– . . . (5) such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded." 29 U.S.C. § 1003 (b). An "excess benefit" plan is:

> a plan maintained by an employer solely for the purpose of providing benefits for certain employees in excess of the limitations on contributions and benefits imposed by section 415 of Title 26 on plans to which that section applies without regard to whether the plan is funded. To the extent that a separable part of a plan (as determined by the Secretary of Labor) maintained by an employer is maintained for such purpose, that part shall be treated as a separate plan which is an excess benefit plan.

29 U.S.C. § 1002(36). Title 26 is the Internal Revenue Code. As said earlier, the document describing the Excess Benefit Plan directly states the purpose of such plan:

> The purpose of the Excess Benefit Plan is to provide certain salaried employees with a pension benefit payable from employer funds, notwithstanding the limitations of Section 415 of the Internal Revenue Code as from time to time in effect (or of any similar provisions of the Code or any other law or regulations that may now or hereafter limit benefits payable under qualified pension or retirement plans (all of which are herein referred to as "Section 415 limitations")), having an actuarial value equivalent to the excess of the amount of benefits which would have been payable to such employees under the Retirement Income Plan for Salaried Employees of Engelhard Corporation ("Pension Plan") were it not for the Section 415 limitations over the amount thereof in fact payable under the Pension Plan.

(Pl.'s Ex. B at ¶ 1). Plaintiff contends that this expressly stated purpose of the plan offered by Engelhgard falls squarely within the ERISA definition of "excess benefit" plan. Plaintiff also

**FOR PUBLICATION** **CLOSED**

charges that the Excess Benefit Plan is unfunded, meeting the second requirement of section 4(b), because benefits under the Excess Benefit Plan were paid from Engelhard's general assets, and were not separately funded. (Pl.'s Ex. B at ¶ 5(vi)(d)); Demery v. Extebank Deferred Compensation Plan (B), 216 F.3d 283, 287 (2d Cir. 2000) (noting that a plan is unfunded within the meaning of ERISA where benefits thereunder will be paid solely from the general assets of the employer). Defendants do not dispute this. Thus, the only issue whether the Excess Benefit Plan falls within section 4(b)'s exceptions to ERISA is does the plan meets the statutory definition of an "excess benefit" plan.

Defendants counter that even though the Complaint does not mention ERISA, plaintiff's state law claims are completely preempted because they pertain to a benefit plan governed by ERISA. Metropolitan Life Ins. Co. v. Taylor, 481 U.S. 58, 63-67 (1987) (applying complete preemption doctrine when plaintiff asserted common law claims with respect to an employee benefit plan subject to ERISA). Englehard argues that its Excess Benefit Plan is a "top hat" plan rather than an "excess benefit" plan" A "top hat" plan is an unfunded plan maintained by an employer "primarily for the purpose of providing deferred compensation to a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(3), 1101(a); Garratt v. Knowles, 245 F.3d 941, 946 n.4 (7th Cir. 2001). While top hat plans are exempt from some of ERISA's provisions, they are subject to ERISA's criminal and civil enforcement provisions. In re New England Mut. Life Ins. Co. Sales Practices Litig., 324 F. Supp. 2d 288, 309 (D.Mass. 2004) (Consequently, "a 'top hat' plan is subject to complete preemption by ERISA to the same extent as a plan that is not a 'top hat' plan."); Moore v. Raytheon Corp., 314

**FOR PUBLICATION** **CLOSED**

F. Supp. 2d 658, 663 (N.D.Tex. 2004) ("Because a top hat plan is subject to ERISA's enforcement provisions and is an employee benefit plan within the meaning of ERISA, all state law claims that relate to the plan are preempted."); Moore v. Acme Corrugated Box Co., Inc., 1998 WL 252043, *11 (E.D.Pa. 1998) ("'Top hat' plans are 'employee benefit plans' which are covered by ERISA generally, but are exempted from many of ERISA's requirements."). The Seventh Circuit has articulated the difference between a top hat plan and an excess benefit plan: "In terms of design, the difference between a top hat plan and an excess benefit plan is, in most circumstances, that the top hat plan can have multiple broad purposes, while an excess benefit plan has the sole purpose of avoiding the limitations imposed by § 415 of the Internal Revenue Code." Garratt, 245 F.3d at 946 n.4.

Defendants state that it is the statutory definition and not nomenclature that determines if a benefit plan is an excess benefit plan. See Goldstein v. Johnson & Johnson, 251 F.3d 433, 438 n.2 (3d Cir. 2001) (noting that despite the defendant having termed its plan an "Excess Benefit Plan," the Court determined on a previous appeal that the plan was, in fact, a top hat plan, and governed by ERISA). Defendants argue that the Excess Benefit Plan does not satisfy the statutory definition of "excess benefit" plan because it was not maintained solely for the purpose of providing benefits in excess of the limitations imposed by section 415 of the Internal Revenue Code. Defendants claim that because the stated purpose references other limitations on benefits payable under qualified pension or retirement plans, this renders the purpose of the Excess Benefit Plan to be more than just avoiding the limitations of section 415. With regard to the

statement in the Excess Benefit Plan that ERISA does not apply to it, defendants charge such statement does not trump the statutory definition.

To rebut defendants' argument that the purpose of the Excess Benefit Plan is not solely to avoid the limitations of section 415, plaintiff argues that the portion of the sentence in the Excess Benefit Plan relied on by defendants - "notwithstanding the limitations of section 415 of the Internal Revenue Code as from time to time in effect (or of any similar provisions of the Code or any other law or regulations that may now or hereafter limit benefits payable under qualified pension or retirement plans (all of which are herein referred to as 'Section 415 limitations'))" - is nothing more than a broad reference to the limitations of section 415 of the IRC and only that section.

To support his interpretation of the purpose of the plan, plaintiff relies on Gamble v. Group Hospitalization & Medical Services, Inc., 38 F.3d 126 (4th Cir. 1994).  In Gamble, the Fourth Circuit found that a plan was an "excess benefit" plan because the stated purpose of the plan was "[w]hereas, benefits payable by [the tax qualified plans] . . . may be limited because of the provisions of Section 415 of the Internal Revenue Code of 1954 . . . [Group Hospitalization] hereby adopts the Excess Benefit Plan . . . ."  Id. at 129.  The Gamble plaintiff argued that the plan was not an "excess benefit" plan because use of the words "may be" in the stated purpose meant that the sole purpose was not to avoid section 415 limitations.  He argued that the intent of the defendant in adopting the plan was to provide benefits in excess of all limitations, not just those in section 415, relying on meeting minutes and calculations made by the accounts who determined the amounts of benefits paid out under the plan.  More specifically, he claimed that

**FOR PUBLICATION**                                                                                         **CLOSED**

the defendant also intended to provide benefits in excess of the limitations imposed by section 401(a)(17) of the Internal Revenue Code. The Fourth Circuit found Gamble's arguments unpersuasive. The court said that "on the face of the document alone, it appears that the plan was created solely for the purpose of providing benefits in excess of the limitation imposed by I.R.C. § 415." Id. With respect to the limitation to section 415 in the definition of "excess benefit plan," the court cited an opinion letter prepared by defendant's counsel on whether the defendant's plan took into account the section 401(a)(17) limitation:

> The ERISA provision which authorizes so-called unfunded excess benefit plans speaks only of arrangements which provide benefits and/or contributions which are in excess of the allowable Section 415 limits. And the plan which we prepared tracks that definition and only supplements benefits and contributions which are lost because of the Section 415 limits. For any number of reasons, the $200,000 compensation ceiling was not placed on Section 415 of the Internal Revenue Code. Instead, it is found in Section 401(a)(17). Consequently, neither the ERISA definition of excess benefit plan, nor the plan which we prepared address themselves to benefits or contributions which are lost not because of Section 415 limits, but as a result of the new compensation dollar limit.

Id. at 131. The Gamble court found that the plan's purpose was only to provide benefits in excess of section 415 limitations. Id.

In Bass v. Mid-America Co., Inc., 1995 WL 622397, *4 (N.D.Ill. Oct. 20, 1995), the court stated that "[w]hether a plan fits into ERISA's 'excess benefit plan' exemption must be determined through an examination of the surrounding circumstances and an analysis of the stated purpose of the plan as determined by its plain language." (citing Northwestern Mut. Life Ins. Co. v. Resolution Trust Corp., 848 F. Supp. 1515, 1519 (N.D.Ala. 1994); Flandreau v. Signode Supply Corp., 1990 WL 7370 *6 (N.D. Ill. 1990)). Heeding this advice, the Court concludes, just as the Fourth Circuit found in Gamble, that the intended purpose of the Excess

**FOR PUBLICATION**                                                                                          **CLOSED**

Benefit Plan is to solely provide benefits in excess of the section 415 limitations and nothing more. The only provision of the Internal Revenue Code referenced in the plan is section 415. To the extent defendants argue that the Excess Benefit Plan also provides benefits that are in excess of the limitations imposed by section 401(a)(17), (unmentioned in the Plan), defendants have failed to show that those benefits would exceed the limitations of section 415. The actual questioned language - (*or of any similar provisions of the Code or any other law or regulations that may now or hereafter limit benefits payable under qualified pension or retirement plans (all of which are herein referred to as "Section 415 limitations"*)) - is completely surrounded by section 415:

> The purpose of the Excess Benefit Plan is to provide certain salaried employees with a pension benefit payable from employer funds, notwithstanding the limitations of Section 415 of the Internal Revenue Code as from time to time in effect (*or of any similar provisions of the Code or any other law or regulations that may now or hereafter limit benefits payable under qualified pension or retirement plans (all of which are herein referred to as "Section 415 limitations"*)), having an actuarial value equivalent to the excess of the amount of benefits which would have been payable to such employees under the Retirement Income Plan for Salaried Employees of Engelhard Corporation ("Pension Plan") were it not for the Section 415 limitations over the amount thereof in fact payable under the Pension Plan.

(Pl.'s Ex. B at ¶ 1). The linguistic boundaries contain but one purpose - to provide benefits in excess of section 415 limitations. An axiom of language construction is that specific provisions control general terms or clauses. See Dontzin v. Myer, 301 N.J.Super. 501, 507, 694 A.2d 264 (App.Div.1997); Assisted Living Associates of Moorestown, L.L.P. v. Moorestown Tp., 31 F. Supp. 2d 389, 399 (D.N.J. 1998).

**FOR PUBLICATION**                                                                **CLOSED**

        Nor is this conclusion contradictory of a Seventh Circuit case heavily emphasized by defendants, Olander v. Bucyrus-Erie Co., 187 F.3d 599 (7th Cir. 1999). In Olander, the parties disputed whether the supplemental pension benefit plan was a "top hat" plan or an "excess benefit" plan. The court found that the plan was not an "excess benefit" plan. Id. at 604. Unlike the Excess Benefit Plan here, the Olander plan had three purposes by its own terms: (a) avoiding the § 415 limitations; (b) providing benefits for deferred compensation received but not included for benefits calculation under the defendant's regular pension plan; or (c) providing benefits for compensation not includable under the regular pension plan by reason of any other provision of the Code. Id. Only one of these three purposes referenced section 415 limitations, whereas the Excess Benefit Plan here has one stated purpose - to avoid the limitations of section 415.

        Engelhard's intent in adopting the Excess Benefit Plan is obvious in light of both its stated purpose and the surrounding circumstances. The benefits it intended to provide to certain executives were only those that would have been capped by the limitations of section 415.

        To be plain, all the analysis compels the conclusion that the Court does not have subject matter jurisdiction of this cause. Such finding is also consistent with the principle that all doubts should be resolved in favor of remand. Boyer, 913 F.2d at 111.

        Plaintiff requests attorneys' fees and costs incurred as a result of the removal of this action on the ground that defendants had no basis to remove the matter to federal court. As plaintiff correctly states, this Court has broad discretion in deciding whether to award fees. See Mints v. Educational Testing Service, 99 F.3d 1253, 1260 (3d Cir. 1996). Exercising that discretion, the Court finds that an award of fees and costs here is inappropriate. The issue

**FOR PUBLICATION**                                                                                          **CLOSED**

presented to the Court was not nearly as black and white as plaintiff would characterize it and there was a colorable basis for defendants' removal of the action. Plaintiff's request for an award of attorneys' fees and costs is denied.

## CONCLUSION

Plaintiff's motion to remand is GRANTED, and the case is hereby REMANDED to the Superior Court of New Jersey, Law Division, Morris County.


<u>s/William H. Walls</u>
United States District Judge

**FOR PUBLICATION**                                                                                          **CLOSED**

**Appearances**

Glenn Butash
John Coyle
Pitney Hardin LLP
P.O. Box 1945
Morristown, New Jersey 07932

Anthony Paduano
Paduano & Weintraub LLP
1251 Avenue of the Americas, 9th Floor
New York, New York 10020

Joseph Dolan
Laufer, Knapp, Torzewski & Dalena LLC
23 Cattano Avenue
at Chancery Square
Morristown, New Jersey 07960